# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 23, 2007        Decided June 8, 2007

No. 04-1385

NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB,
ENVIRONMENTAL INTEGRITY PROJECT,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
STEPHEN L. JOHNSON, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

COALITION FOR RESPONSIBLE WASTE
INCINERATION *ET AL*;
UTILITY AIR REGULATORY GROUP;
UTILITY SOLID WASTER ACTIVITIES GROUP *ET AL.*,
INTERVENORS

No. 04-1386

AMERICAN MUNICIPAL POWER-OHIO, INC.;
CITY OF DOVER, OHIO; CITY OF HAMILTON, OHIO;
CITY OF ORVILLE, OHIO;
CITY OF PAINESVILLE, OHIO,
CITY OF SHELBY, OHIO; CITY OF ST. MARYS, OHIO,
PETITIONERS

v.

2

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

———

No. 05-1302

NATURAL RESOURCES DEFENSE COUNCIL;
ENVIRONMENTAL INTEGRITY PROJECT,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
STEPHEN L. JOHNSON, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

———

No. 05-1434

LOUISIANA ENVIRONMENTAL ACTION NETWORK;
SIERRA CLUB,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

UTILITY SOLID WASTER ACTIVITIES GROUP *ET AL.*,
INTERVENORS

———

3

No. 06-1065

NATURAL RESOURCES DEFENSE COUNCIL;
SIERRA CLUB; ENVIRONMENTAL INTEGRITY PROJECT,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY;
STEPHEN L. JOHNSON, ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

———

On Petitions for Review of Final Rules of the
Environmental Protection Agency

———

*James S. Pew* argued the cause for the Environmental Petitioners. *John D. Walke* was on brief.

*Douglas A. McWilliams* argued the cause for the Municipal Petitioners. *Allen A. Kacenjar* was on brief.

*Stuart Rabner*, Attorney General, and *Maurice A. Griffin* and *Kevin P. Auerbacher*, Deputy Attorneys General, State of New Jersey; *Robert J. Spagnoletti*, Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Assistant Attorney General, District of Columbia; *Eliot Spitzer*, Attorney General at the time the brief was filed, and *Jacob E. Hollinger* and *J. Jared Snyder*, Assistant Attorneys General, State of New York; *G. Steven Rowe*, Attorney General, and *Gerald D. Reid*, Assistant Attorney General, State of Maine, were on brief for *amici curiae* the State of New Jersey *et al.* in support of the Environmental Petitioners. *Edward E. Schwab*, Deputy Attorney General, District of Columbia, *Peter H.*

*Lehner*, Assistant Attorney General, State of New York, and *Jean P. Reilly*, Assistant Attorney General, State of New Jersey, entered appearances.

*Geoffrey M. Klineberg* and *Mary Ann McGrail* were on brief for *amici curiae* State and Territorial Air Pollution Program Administrators and the Association of Local Air Pollution Control Officials in support of the Environmental Petitioners.

*Pamela S. Tonglao*, *Norman L. Rave, Jr.* and *Catherine M. Wannamaker*, Attorneys, United States Department of Justice, argued the cause for the respondents. *Brian L. Doster*, Counsel, United States Environmental Protection Agency, was on brief. *Michele L. Walter*, Attorney, United States Department of Justice, entered an appearance.

*Douglas H. Green* argued the cause for intervenors Utility Solid Waste Activities Group *et al*. in support of the respondents. *James R. Rathvon* and *Aaron J. Wallisch* were on brief. *Richard S. Wasserstrom* entered an appearance.

*Claudia M. O'Brien* argued the cause for the Industry Intervenors in support of the respondents. *Cassandra Sturkie* and *Ronald A. Shipley* were on brief. *Craig S. Harrison*, *Lee B. Zeugin*, *Leslie A. Hulse* and *William F. Lane* entered appearances.

*Marc D. Machlin* and *Charles H. Carpenter* were on brief for *amicus curiae* Rubber Manufacturers Association in support of the respondents.

*Scott H. Segal* was on brief for *amicus curiae* American Boiler Manufacturers Association in support of the respondents.

Before: HENDERSON, RANDOLPH and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* RANDOLPH.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* ROGERS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: We address in this proceeding five petitions seeking review of two separate rules promulgated by the Environmental Protection Agency (EPA): (1) the National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters, 69 Fed. Reg. 55,218 (Sept. 13, 2004), *as amended on recons.*, 70 Fed. Reg. 76,918 (Dec. 28, 2005), (Boilers Rule), promulgated pursuant to section 112 of the Clean Air Act (CAA), 42 U.S.C. § 7412; and (2) the Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units, 70 Fed. Reg. 55,568 (Sept. 22, 2005) (CISWI Definitions Rule), *amending* Standards of Performance for New Stationary Sources and Emissions Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units, 65 Fed. Reg. 75,338 (Dec. 1, 2000) (CISWI Rule), promulgated pursuant to CAA section 129, 42 U.S.C. § 7429. Four environmental organizations—the Natural Resources Defense Council, the Sierra Club, the Environmental Integrity Project and the Louisiana Environmental Action Network (collectively, Environmental Petitioners)—challenge the CISWI Definitions Rule on the ground that its narrow definition of "commercial or industrial waste" contradicts the plain language of CAA section 129 and therefore impermissibly constricts the class of "solid waste incineration unit[s]" that are subject to the emission standards of the CISWI Rule. The Environmental Petitioners also challenge specific emission standards that EPA promulgated in the Boilers Rule and EPA's methodology for setting them. A second set of petitioners—the American Municipal Power-Ohio, Inc. and six

of its members, the cities of Dover, Hamilton, Orrville, Painesville, Shelby and St. Mary's, (collectively, Municipal Petitioners)—challenges the Boilers Rule on the grounds that EPA failed to comply with the requirements of the Regulatory Flexibility Act, 5 U.S.C. §§ 601 *et seq.*, and that the standards as applied to small municipal utilities are unlawful. For the reasons set out below, we conclude that EPA's definition of "commercial or industrial waste," as incorporated in the definition of "commercial and industrial solid waste incineration unit" (CISWI unit), is inconsistent with the plain language of section 129 and that the CISWI Definitions Rule must therefore be vacated. We further conclude that, because the Boilers Rule must be substantially revised as a consequence of our vacatur and remand of the CISWI Definitions Rule, the Boilers Rule as well must be vacated.

## I.

We first set out the statutory and regulatory background of the two challenged rules.

### A. The Boilers Rule

CAA section 112 requires EPA to set a national emission standard for each category or subcategory of "major sources" of "hazardous air pollutant" (HAP) emissions, 42 U.S.C. § 7412(d)(1), that is, of stationary sources that emit (or have potential to emit) "10 tons per year or more of any [HAP] or 25 tons per year or more of any combination of [HAPs]," *id.* § 7412(a)(1).[1] Section 112, as in effect until 1990, directed the EPA Administrator to "establish any such standard at the level

---

[1]The Congress provided an "initial list" of HAPs, 42 U.S.C. § 7412(b)(1), and directed EPA to "periodically review the list" and, "where appropriate, revise such list by rule, adding pollutants which present, or may present . . . a threat of adverse human health effects . . . or adverse environmental effects," 42 U.S.C. § 7412(b)(2).

which in his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant." 42 U.S.C. § 7412(b)(1)(B) (1990). In 1990, the Congress amended section 112 to require technology-based standards in place of the previous risked-based standards. Clean Air Act Amendments, Pub. L. No. 101-549, 104 Stat. 2399 (1990). Under the 1990 CAA Amendments, EPA sets emission standards based on the "maximum achievable control technology" or "MACT" in a two-step process.

First, EPA identifies a MACT floor for each pollutant and source category. For "new sources" of HAP emissions, the MACT floor is "the emission control that is achieved in practice by the best controlled similar source, as determined by the [EPA] Administrator"; for "existing sources," the MACT floor is "the average emission limitation achieved by the best performing 12 percent of the existing sources" or, if there are fewer than 30 sources, "the average emission limitation achieved by the best performing 5 sources." 42 U.S.C. § 7412(d)(3). In the second step of the process, EPA selects as its technology-based standard either the applicable MACT floor identified in the first stage or a "beyond the floor" limitation more stringent than the MACT if such a standard is "achievable" in light of costs and other factors and methods listed in section 7412(d)(2). *See generally Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 857-58 (D.C. Cir. 2001) (per curiam) (explaining two-step MACT process for hazardous waste combustors); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 628-29 (D.C. Cir. 2000) (explaining two-step MACT process for portland cement manufacturing plants).

On September 13, 2004, EPA issued the Boilers Rule, which identified 18 subcategories of boilers emitting four different types of HAPs. *See* 69 Fed. Reg. at 55,223-24. EPA set out to establish the MACT floor for each subcategory emitting each HAP according to the effectiveness of various add-on

technologies. *See* 68 Fed. Reg. 1660, 1674 (Jan. 13, 2003) (proposed rule). Applying this methodology, EPA set 25 numerical emission standards. For the remaining 47 boiler subcategory/HAP emissions, EPA determined that the appropriate MACT floor was "no emissions reduction" because "the best-performing sources were not achieving emissions reductions through the use of an emission control system and there were no other appropriate methods by which boilers and process heaters could reduce HAP emissions." 69 Fed. Reg. at 55,233. Accordingly, EPA adopted a "no control" standard, *id.*, and, in addition, it set risk-based standards, also known as health-based standards, as alternatives to the MACT-based standards for hydrogen chloride and manganese. *Id.* at 55,227, 55,255.

On November 12, 2004, the Municipal Petitioners filed a petition for review of the Boilers Rule, challenging its Regulatory Flexibility Act certification and its treatment of small municipal utilities. The same day, the Environmental Petitioners filed both a petition for judicial review of the Boilers Rule and an administrative petition for reconsideration by EPA, challenging the no control standard and the risk-based alternatives. By notice published June 27, 2005, EPA granted reconsideration in part and solicited comments on the health-based compliance alternative for manganese in particular and, in general, the methodology for demonstrating eligibility for and compliance with health-based alternatives. 70 Fed. Reg. 36,907 (June 27, 2005). On July 29, 2005, the Environmental Petitioners filed a petition for review of the reconsideration notice insofar as it denied reconsideration in other respects. On December 28, 2005, EPA issued a reconsideration decision which modified the health-based alternative methodology. 70 Fed. Reg. 76,918 (Dec. 28, 2005). The Environmental Petitioners then filed another petition for review of the Boilers Rule on February 14, 2006.

### B. The CISWI Definitions Rule

In addition to amending section 112, the 1990 CAA amendments also added section 129, which requires EPA to establish specific performance standards, including emission limitations, for "solid waste incineration units" generally, 42 U.S.C. § 7429(a)(1)(A), and, in particular, for "solid waste incineration units combusting commercial or industrial waste," *id.* § 7429(a)(1)(D). Section 129 defines "solid waste incineration unit" as "a distinct operating unit of *any* facility which combusts *any* solid waste material from commercial or industrial establishments or the general public (including single and multiple residences, hotels, and motels)." *Id*. § 7429(g)(1) (emphases added). The statute includes four express exceptions to this definition for: (1) units requiring a permit under 42 U.S.C. § 6925, (2) "materials recovery facilities . . . which combust waste for the primary purpose of recovering metals," (3) qualifying "small power production facilities" and "cogeneration facilities" which combust "homogeneous waste" "for the production of electric energy or . . . for the production of electric energy and steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating or cooling purposes" and (4) qualifying "air curtain incinerators" that burn only "wood wastes, yard wastes and clean lumber." *Id*. § 7429(g)(1).

Like the section 112 standards, section 129 standards are based on a MACT floor, which is substantially the same as under section 112: for new sources, it is "the emissions control that is achieved in practice by the best controlled similar unit"; for existing units, it is "the average emissions limitation achieved by the best performing 12 percent of units in the category." *Id*. § 7429(a)(2). Also, as with section 112 standards, EPA is to establish an above-the-floor standard if EPA determines it is "achievable" taking into account costs and other factors. *Id*.; *see Ne. Md. Waste Disposal Auth. v. EPA*, 358

F.3d 936, 944 (D.C. Cir. 2004) (per curiam). Although section 129 "establishes emission requirements virtually identical to section [112's]," *Nat'l Lime Ass'n v. EPA*, 233 F.3d at 631, the statutes nonetheless differ in two respects of particular significance here. First, as noted above, section 112's MACT standards apply only to "major" sources of HAP emissions, while section 129's MACT standards apply across the board to all solid waste incineration disposal units in a given category. *Compare* 42 U.S.C. § 7412(d)(1) ("The [EPA] Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) of this section . . . .") *with id.* § 7429(a)(1)(A) ("The [EPA] Administrator shall establish performance standards and other requirements pursuant to [42 U.S.C. § 7411] and this section for each category of solid waste incineration units."). Second, section 129 requires that emission standards be set for certain pollutants that are not classified as section 112 HAPs (at least not in section 112's "initial list," *see supra* note 1) and therefore are not subject to section 112's MACT standards, *e.g.* sulphur dioxide, nitrogen oxides and particulate matter. *Compare id*. § 7429(a)(4) *with id*. § 7412(b)(1). Finally, the Congress made section 129's standards and section 112's standards mutually exclusive by directing that "no solid waste incineration unit subject to performance standards under this section and [42 U.S.C. § 7411] shall be subject to standards under section 7412(d)." *Id*. § 7429(h)(2).

On December 1, 2000, EPA issued the CISWI Rule, setting emission standards for commercial and industrial solid waste incinerators pursuant to section 129. The Sierra Club filed a petition for review and the Louisiana Environmental Action Network and the National Wildlife Federation filed a petition for reconsideration by EPA, objecting that EPA had not subjected the rule's definitions to comment. EPA granted the motion for

reconsideration and filed a motion for voluntary remand, which the court granted on September 6, 2001.

On remand, EPA solicited comments on the CISWI Rule's definitions of "solid waste," "commercial and industrial waste" and "CISWI unit."    Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial or Industrial Solid Waste Incineration Units, 69 Fed. Reg. 7390 (Feb. 17, 2004).  On September 22, 2005, after receiving comments, EPA issued the CISWI Definitions Rule, which, as relevant here, contains definitions that are substantively the same as before reconsideration.  The CISWI Definitions Rule defines a "commercial or industrial solid waste incineration unit," in relevant part, as "any combustion unit that combusts commercial or industrial waste (as defined in this subpart)" and then defines "commercial or industrial waste" to include only waste that is combusted at a facility that cannot or does not use a process that recovers thermal energy from the combustion for a useful purpose.  70 Fed. Reg. at 55,580-81 (codified at 40 C.F.R. § 60.2265).[2]  The

---

[2]The CISWI Rule EPA issued on December 1, 2000, had defined the terms as follows:

Commercial and industrial solid waste incineration (CISWI) unit means any combustion device that combusts commercial and industrial waste, as defined in this subpart. . . .

Commercial and industrial waste means solid waste combusted in an enclosed device using controlled flame combustion without energy recovery that is a distinct operating unit of any commercial or industrial facility (including field-erected, modular, and custom built incineration units operating with starved or excess air), or solid waste combusted in an air curtain incinerator without energy recovery that is a distinct operating unit of any commercial or industrial facility.

Environmental Petitioners filed a petition for review of the CISWI Definitions Rule on November 21, 2005.

## II.

### *A. CISWI Definitions Rule*

The Environmental Petitioners challenge EPA's definition of "CISWI unit" insofar as it incorporates EPA's definition of "commercial or industrial waste," asserting that it is inconsistent with the plain language of section 129. We review the Environmental Petitioners' challenge to EPA's interpretation of section 129 under the two-step framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Ne. Md. Waste Disposal Auth.*, 358 F.3d at 944 ("*Chevron* . . . governs our review of Industry Petitioners' claim that the 2000 Rule conflicts with § 129(a)(2)."). Under *Chevron*:

> We first ask "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." If the "statute is silent or ambiguous with respect to the specific issue," however, we move to the second step and defer to the agency's interpretation as long as it is "based on a permissible construction of the statute."

*Bluewater Network v. EPA*, 372 F.3d 404, 410 (D.C. Cir. 2004) (quoting *Chevron*, 467 U.S. at 842-43). We agree with the Environmental Petitioners that EPA's definition of "commercial or industrial waste," as incorporated in the definition of CISWI units, stumbles on *Chevron*'s first step because it conflicts with the plain language of section 129.

---

65 Fed. Reg. at 75,359.

Section 129 on its face applies to "solid waste incineration units" generally, 42 U.S.C. § 7429(a)(1)(A), and specifically to "solid waste incineration units combusting commercial or industrial waste," *id.* § 7429(a)(1)(D). The statute further expressly defines "[t]he term 'solid waste incineration unit'" plainly and broadly to include "a distinct operating unit of *any* facility which combusts *any* solid waste material from commercial or industrial establishments or the general public (including single and multiple residences, hotels, and motels)." *Id*. § 7429(g)(1) (emphases added). "The word 'any' is usually understood to be all inclusive." *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 488 (D.C. Cir. Mar. 30, 2007); *see New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006) ("In a series of cases, the Supreme Court has drawn upon the word 'any' to give the word it modifies an 'expansive meaning' when there is 'no reason to contravene the clause's obvious meaning.'" (quoting *Norfolk S. Rwy. Co. v. Kirby*, 543 U.S. 14, 31-32 (2004)) (citing *HUD v. Rucker*, 535 U.S. 125, 130-31 (2002); *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). Applying the usual meaning here, we interpret section 129 under *Chevron* step 1 to unambiguously include among the incineration units subject to its standards any facility that combusts any commercial or industrial solid waste material at all—subject to the four statutory exceptions identified above. *See supra* p. 9. The definition EPA promulgated in the CISWI Definitions Rule, however, constricts the scope of this plain, broad language.

The CISWI Definitions Rule defines the term "CISWI unit" to include "any combustion unit that combusts commercial or industrial waste (*as defined in this subpart*)" 70 Fed. Reg. at 55,580 (emphasis added). The same subpart, however, defines "commercial or industrial waste" narrowly to include only "solid waste . . . that is combusted at any commercial or industrial facility using controlled flame combustion in an enclosed, distinct operating unit: (1) Whose design does not provide for energy recovery (as defined in this subpart); or (2) operated

without energy recovery (as defined in this subpart)." 70 Fed. Reg. at 55,572 (codified at 40 C.F.R. § 60.2265). EPA defines the term "energy recovery," in turn, as "the process of recovering thermal energy from combustion for useful purposes such as steam generation or process heating." *Id*. (codified at 40 C.F.R. § 60.2265). The effect of these definitions is to substantially reduce the number of commercial or industrial waste combustors subject to section 129's standards by exempting from coverage any commercial or industrial incinerator combusting "solid waste" if the combustion unit's design permits thermal recovery or the combustion process in fact recovers thermal energy—notwithstanding such a unit plainly fits the statutory definition of "solid waste incineration unit" as *"any* facility which combusts *any* solid waste material from commercial or industrial establishments," 42 U.S.C. § 7429(g)(1) (emphases added). In the rulemaking, EPA asserted its definition simply resolves an ambiguity created by the Congress's failure to provide a statutory definition of "commercial or industrial waste." *See* CISWI Definitions Rule, 70 Fed. Reg. at 55,573 ("CAA section 129 is ambiguous because it does not contain definitions of certain terms. . . . [S]ection 129 does not define commercial or industrial waste. Inherent in EPA's implementation of this statutory provision is the discretion to reasonably define what constitutes this undefined type of solid waste.").[3] We have previously rejected just such an argument, stating unequivocally: "There is no such rule of law." *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006). As we there explained, "[t]he lack of a statutory definition of a word does not necessarily render the meaning of a word

---

[3]EPA seemed to abandon the ambiguity argument in its brief, *see* EPA Br. at 30 (noting absence of definition but drawing no express inference of ambiguity therefrom), but resurrected it at oral argument. *See Natural Res. Def. Council v. EPA*, Nos. 04-1385 *et al.*, 2/23/07 Oral Argument Tr. at 9-10.

ambiguous, just as the presence of a definition does not necessarily make the meaning clear." *Id*. Here, the statutory definition of "solid waste incineration unit" is clear and unambiguous as written—and EPA acknowledges as much when it objects to a "literal" reading of the definition's language. *See* EPA Br. at 24 (asserting that "[a] literal interpretation of the definition of 'solid waste incineration unit' in section 129(g)(1), 42 U.S.C. § 7429(g)(1), would require EPA to treat as an incinerator any facility that combusts any amount of solid waste from a commercial or industrial source"). EPA offers three other arguments to support its definition of "commercial and industrial waste," none of them any more persuasive.

First, EPA asserts the legislative history of section 129 supports its position that "any," as used in the statutory definition of CISWI to modify "solid waste," was intended to bear "a narrower meaning in context than it has in common usage," EPA Br. at 31, thereby allowing thermal energy recovery facilities to be exempted from the definition of "solid waste incineration unit." *Cf. Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047-48 (D.C. Cir. 1997) (stating "Supreme Court has specifically held that in context the word 'any' may be construed in a non-expansive fashion" (citing *O'Connor v. United States*, 479 U.S. 27, 31 (1986)). In particular, EPA points to remarks made by three senators during debate which acknowledged a "solid waste disposal crisis" and supported recycling and recovering resources in the solid waste disposal process—most notably, the remarks of one senator in support of the express statutory exemptions for "secondary materials recovery facilities from these requirements because their specific purpose is to recover valuable materials" and for "facilities regulated under the Public Utilities Regulatory Policy Act," 16 U.S.C. § 824a-3. *See* EPA Brief at 32-34 (citing 1 *A Legislative History of the Clean Air Act Amendments of 1990* 1131 (Comm. Print 1993) (Sen. Dole); 4 *id*. 7049 (Sen. Dole); *id*. at 7051 (Sen. Durenberger); *id*. at 7054 (Sen. Baucus)). "It

is true . . . that we 'may examine the statute's legislative history in order to "shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." ' " *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) (quoting *Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 127 (D.C. Cir. 2000) (quoting *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995))). But " 'the bar is high,' " *id.* (quoting *Williams Cos. v. FERC*, 345 F.3d 910, 914 (D.C. Cir. 2003)), and "only rarely have we relied on legislative history to constrict the otherwise broad application of a statute indicated by its text," *id.* Here, EPA cannot clear the high bar relying solely on the isolated remarks of a few senators. *Cf. Davis County Solid Waste Mgmt. v. EPA*, 101 F.3d 1395, 1407 (D.C. Cir. 1996) (finding contradictory comments of individual senators during section 129 debates "too 'meager [a] record' " to rely on " 'given the clear statutory language' to the contrary") (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1091 (D.C. Cir. 1996)). In any event, the remarks that EPA cites, when viewed in the context of the express and unambiguous provisions in the statute, show only that when the Congress wanted to exempt a particular kind of solid waste combustor from section 129's coverage—based on the desirability of resource recovery or any other interest—it knew how to accomplish this through an express statutory exception and in fact did so for four specific classes of combustion units. *See* 42 U.S.C. § 7429(g)(1). Had the Congress intended to exempt all units that combust waste for the purpose of recovering thermal energy, it could likewise have expressly provided for their exemption in the statute. *See Sierra Club v. EPA*, 294 F.3d 155, 160 (D.C. Cir. 2002) (if statute "details the conditions in which EPA may extend the attainment deadline," "[w]e cannot but infer from the presence of these specific exemptions that the absence of any other exemption for the transport of ozone was deliberate, and that the Agency's attempt to grant such a dispensation is contrary to the intent of the

Congress"); *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (" 'Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.' " (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). But the Congress did not—and EPA may not, consistent with *Chevron*, create an additional exception on its own. In sum, "[i]n this context, there is no reason the usual tools of statutory construction should not apply and hence no reason why 'any' should not mean 'any.' " *New York v. EPA*, 443 F.3d 880, 886 (D.C. Cir. 2006). In *New York v. EPA*, the court rejected EPA's narrow construction of the statutory definition of "modification," contained in CAA section 111, as "*any* physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted," 42 U.S.C. § 7411(a)(4) (emphasis added). The court accorded "an expansive meaning" to the term "any," 443 F.3d at 885-86, thereby expanding the class of new sources subject to new source emission standards. *See* 42 U.S.C. § 7411(a)(2) (defining "new source" as "any stationary source, the construction *or modification* of which is commenced after the publication of regulations . . . prescribing a standard of performance under this section which will be applicable to such source" (emphasis added)); *id.* § 7411(b) (requiring EPA to establish emission standards for "new sources"). The court explained that "the context of the Clean Air Act warrants no departure from the word's customary effect." *New York v. EPA*, 443 F.3d at 885-86. We likewise give an expansive reading to "any" to increase the number of CISWI units subject to section 129's emission standards, reading sections 111 and 129 *in pari materia*. *Cf. Bluewater Network*, 372 F.3d at 411 (reading CAA § 213(a)(3) *in pari materia* with CAA § 202(*l*)(2) as "technology-forcing").

18

Second, EPA contends that "[b]y specifying that the classification of a source turns on its primary function, the [CISWI] Definitions Rule reasonably distinguishes between incinerators, which are 'designed to discard materials by burning them at high temperatures and leaving as little residue as possible,' and boilers, which are 'designed to recover the maximum amount of heat from a material's combustion.' " EPA Br. at 36 (quoting Summary of Public Comments and Responses, OAR-2003-0119-0038, at 15 (JA 1271)). The distinction EPA draws may well be reasonable but it is not the line drawn by the Congress in section 129 to separate a CISWI unit from a boiler when it unambiguously defined the former term as "any facility which combusts *any* solid waste material," 42 U.S.C. § 7429(g) (emphasis added). This plain statutory language governs—and halts our review at *Chevron*'s step 1.

Finally, EPA asserts that section 129(h)(2), which makes section 112's and section 129's standards mutually exclusive (by directing that "no solid waste incineration unit subject to performance standards under [section 129] and [42 U.S.C. § 7411] shall be subject to standards under section [42 U.S.C. §] 7412(d)"), "implicitly gave EPA the discretion to implement the requirements of section 129 in a way that avoids results inconsistent with the statutory purpose." EPA Br. at 41. EPA reasons that section 129's exclusivity language "directs EPA to make the MACT standards mutually exclusive but does not tell EPA how to accomplish this task, instead leaving the line-drawing details to EPA's considered judgment." *Id*. We perceive no such gap in the statute, which simply directs EPA in plain terms to subject a solid waste combustion facility exclusively to section 129's standards, and not to section 112's, if the facility fits section 129's clear definition of "solid waste incineration unit." The provision gives EPA a straightforward directive to draw the distinction based solely on the

applicability *vel non* of section 129's definition. It confers no discretion in this respect, either express or implied.

## B. Boilers Rule

Having determined that EPA's definition of "solid waste incineration unit" conflicts with the plain meaning of section 129 and must therefore be vacated, we next address the Environmental Petitioners' and the Municipal Petitioners' challenges to the Boilers Rule and conclude they are premature as the Boilers Rule cannot survive as currently promulgated.

As the Environmental Petitioners noted at oral argument, if the court requires EPA to revise the CISWI Definitions Rule, as we do in this opinion, the Boilers Rule will need to be revised as well because the universe of boilers subject to its standards will be far smaller and more homogenous after all CISWI units, as the statute unambiguously defines them, are removed from its coverage. *See Natural Res. Def. Council v. EPA*, Nos 04-1385 *et al*., 2/23/07 Oral Argument Tr. at 37-38. Given the likelihood (if not certainty) that the Boilers Rule will change substantially as a result of our vacatur of the challenged "solid waste" definition, we believe the Boilers Rule should be vacated in its entirety and remanded for EPA to repromulgate after revising the CISWI Definitions Rule. *Cf. Friends of the Earth, Inc. v. EPA*, 446 F.3d 140 (D.C. Cir. 2006) (remanding to district court with instruction to vacate "daily load" limits on effluent discharges as inconsistent with statutory language).[4] It is therefore premature to consider the Environmental Petitioners' or the Municipal Petitioners' challenges to the current rule. *Cf. Ala. Power Co. v. EPA*, 40 F.3d 450, 456 (D.C.

---

[4]In light of our vacatur and remand of the entire Boilers Rule, we dismiss as moot EPA's motion for partial vacatur and remand filed March 26, 2007.

Cir. 1994) (vacating rule and declining to resolve issue rendered moot thereby).

In choosing to vacate rather than simply remand the CISWI Definitions Rule and the Boilers Rule, we disagree with our dissenting colleague who would not vacate either of the Rules because "the court has traditionally not vacated the rule if doing so would have adverse implications for public health and the environment." Dissent at 1 (citing *Sierra Club v. EPA*, 167 F.3d 658, 664 (D.C. Cir. 1999); *Nat'l Lime Ass'n v. EPA*, 233 F.3d at 635)). We find the cited cases distinguishable from the situation here.

As a result of our decision today, neither of the two Rules survives remand in anything approaching recognizable form. As the Environmental Petitioners point out, our rejection of EPA's definition of "commercial or industrial waste," as incorporated in the definition of CISWI, will "shift thousands of units that are currently regulated under the section 112 Boilers Rule into the CISWI category, subject to regulation under section 129" and "[a]s a result, the populations of units subject to EPA's boilers and CISWI rules will change substantially," requiring that EPA "recalculate the stringency of the emissions standards for the newly expanded CISWI category and the newly shrunk boilers category." Envtl. Pet'rs Br. at 29. By contrast, in declining to vacate the standard successfully challenged in *Sierra Club*, the court expressly noted it was "possible that EPA may be able to explain it" on remand, 167 F.3d at 664. In *National Lime Association*, we remanded because EPA "failed to consider non-air quality health and environmental impacts of potential beyond-the-floor standards for HAP metals, and because it relied on a factually incorrect assertion in rejecting such standards." 233 F.3d at 635. In neither case did our decision foreclose EPA from promulgating the same standards on remand.

Moreover, we find this case much like *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855 (D.C. Cir. 2001) (per curiam), in which we vacated the challenged emission standards, notwithstanding the environmental petitioners' request to leave them intact, because we had "chosen not to reach the bulk of industry petitioners claims, and leaving the regulations in place during remand would ignore petitioners' potentially meritorious challenges." 255 F.3d at 872. Similarly here, we elect not to address potentially meritorious challenges to the Boilers Rule raised by the Municipal Petitioners—that EPA violated the CAA by failing to create a separate subcategory for small municipal utilities.

In light of the need for wholesale revision on remand of both the CISWI Definitions Rule and the Boilers Rule and the effect that leaving the Boilers Rule in place would have on the Municipal Petitioners, we believe the appropriate course is to vacate the Rules in their entirety. To remedy the resulting lack of standards, any party "may file a motion to delay issuance of the mandate to request either that the current standards remain in place or that EPA be allowed reasonable time to develop interim standards." *Cement Kiln*, 255 F.3d at 872 (citing *Columbia Falls Aluminum Co. v. EPA,* 139 F.3d 914, 924 (D.C. Cir. 1998)).

For the foregoing reasons, we grant the Environmental Petitioners' petitions for review of the CISWI Definitions Rule (No. 05-1434) and consequently vacate and remand both the CISWI Definitions Rule and the Boilers Rule. We further dismiss as moot both the Environmental Petitioners' and the Municipal Petitioners' petitions for review of the vacated Boilers Rule (Nos. 04-1385, 04-1386, 05-1302 and 06-1065).

*So ordered*.

RANDOLPH, *Circuit Judge*, *concurring*: I write separately to address the question whether a court, after finding agency action unlawful, should remand the case to the agency without vacating the illegal rule or order. In cases governed by the Administrative Procedure Act, I have long believed that the law requires us to vacate the unlawful agency rule. *See* 5 U.S.C. § 706(2). I also believe that in cases such as this, in which APA § 706(2) does not apply, vacating and remanding should be the preferred course.

Contrary to the apparent view of Judge Rogers, our precedents on this question fall into no particular pattern. Often we vacate and remand. Sometimes we simply remand. Rarely do we explain why we favored one disposition over the other. And sometimes it is not even clear what disposition we intended.[1] Our court's remedial judgment varies even in seemingly identical cases involving the same agency. This "inconsistent" treatment of cases has not gone unnoticed. *See* Kristina Daugirdas, Note, *Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective Agency Rulemakings*, 80 N.Y.U. L. REV. 278, 293 (2005).

In the past, when we have vacated rules or orders and remanded to the agency, we have indicated that we would entertain a motion for a stay of the mandate while the agency took corrective action.[2] There are several reasons why we

---

[1] *See* William S. Jordan, III, *Ossification Revisted: Does Arbitrary & Capricious Review Significantly Interfere with Agency Ability to Achieve Regulatory Goals Through Informal Rulemaking?*, 94 Nw. U. L. REV. 393, 410 & n.88 (2000) (finding that in twenty-eight of the sixty-one rulemaking cases studied our court "did not explicitly state whether or not it was vacating the rule at issue").

[2] *See, e.g.*, *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001) (stating that EPA and other parties "may file

should prefer this course in non-APA cases like this one in which the court has some remedial discretion. Vacating an order or rule and then considering a stay motion has several distinct advantages over just remanding. In the first place, it preserves the adversarial process.[3] Remand-only decisions are

_____

a motion to delay issuance of the mandate to request either that the current standards remain in place or that EPA be allowed reasonable time to develop interim standards"); *U.S. Tel. Ass'n v. FCC*, 188 F.3d 521, 531 (D.C. Cir. 1999); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 924 (D.C. Cir. 1998); *Envtl. Def. Fund, Inc. v. EPA*, 672 F.2d 42, 57 (D.C. Cir. 1982) (observing that "following the court's decision," EPA and other parties "participated in extensive deliberations . . . to seek [and obtain] a stay of the mandate and develop a program to achieve a revised regulatory scheme"); *cf. Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1375 (D.C. Cir. 2004) (Randolph, J., concurring), *withdrawn in part on other grounds*, 393 F.3d 1315 (D.C. Cir. 2005); *Schurz Commc'ns Inc. v. FCC*, 982 F.2d 1043, 1057 (7th Cir. 1992).

[3] The post-argument filings in this case do not, as the dissent supposes, fully address the remedial issues. After oral argument, EPA filed a motion seeking both partial remand of the Boilers Rule for revisions consistent with this court's intervening decision in *Sierra Club v. EPA*, 479 F.3d 875 (D.C. Cir. 2007) (per curiam), and partial vacatur of certain compliance deadlines and emissions limits to allow for the agency's intended revisions. That motion and the filings accompanying it addressed issues related to, but distinct from, the remedial issues presented by our unanimous holding that EPA unlawfully defined "commercial or industrial waste" in a way that will require substantial alterations to both challenged rules, *see* Op. at 6, 12-21. As one of the parties put it: "Considering a stay of this Court's mandate (in whole or in part) and/or holding EPA to a remand deadline may be appropriate topics for the parties to discuss, and for this Court to evaluate. But . . . an informed, non-hypothetical discussion can occur only *after* this Court issues its decision." Resp. & Opp'n of Indus. Intervenors to Envtl. Pet'rs' Opp'n to EPA's Mot.

3

almost always reached without input from the parties. The briefs scarcely ever deal with the remedial question. That is perfectly understandable. It may be impossible for petitioners, agencies, or intervenors to anticipate exactly how the court's decision will come out. There may be challenges to many rules or many aspects of one rule. The court may uphold some and reject others. Different consequences can result from different combinations. Besides, agencies, in their presentations to the court, do not relish anticipating a loss. No litigant does. To require the parties to address the subject in each case would waste their time and the court's in all cases in which the agency prevails.

The upshot is that remand-only decisions are being made without sufficient information, which is one of the main reasons the cases are so difficult to reconcile. In contrast, post-decision stay motions enable us to decide with our eyes open. The court will have the benefit of hearing from all sides. In deciding whether to allow unlawful agency action to remain in place during the remand (by way of a stay), the court will have the evidence needed to assess the consequences. And that decision can be made in accordance with this court's long-standing principles governing stays – irreparable harm, probability of success, public interest, and so forth. *See, e.g.*, *Va. Petroleum Jobbers v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 (D.C. Cir. 1977); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 673-74 (D.C. Cir. 1985) (per curiam)*; Cuomo v. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam).

The existence of a stay with time limits, rather than an

for Voluntary Partial Vacatur and Cross-Mot. for Deadline to Govern Remand at 4 (emphasis in original).

open-ended remand without vacating, will give the agency an incentive to act in a reasonable time, given the other constraints on its resources. When we simply remand the agency has no such incentive. A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such. *See* Daugirdas, *supra*, at 302-04.

Notice too the distortion of the proper allocation of burdens among the parties. When the case is simply remanded, and the agency drags its feet, the winning party's only recourse is to bring a mandamus petition and clear all the hurdles such actions entail. On the other hand, in proceedings on motions for stays the burden is where it should be – on the losing agency, which will have to convince the court that private parties should be required to comply with an illegal order or rule while the agency responds to the ruling against it. If an extension of time is needed, the burden will remain on the losing agency.

One final thought. A remand-only disposition may unfairly deprive parties of the opportunity to obtain Supreme Court review of our decision on the merits. If a district court merely remands a case to an agency, we hold that there is no final judgment to appeal. *See In re St. Charles Preservation Investors, Ltd.*, 916 F.2d 727, 729 (D.C. Cir. 1990) (per curiam) (observing well-settled rule that "a district court order remanding a case to an agency for significant further proceedings is not final"); *see also Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 881 (D.C. Cir. 2000) (holding that appellate court lacked jurisdiction to review district court order remanding to agency for further proceedings). It is entirely possible that the Supreme Court would take the same view of our remand-only dispositions and hold that there is no final order suitable for its review.

ROGERS, *Circuit Judge*, concurring in part and dissenting in part: I join the court in holding that the final rule on the Standards of Performance for New Stationary Sources and Emissions Guidelines for Existing Source: Commercial and Industrial Solid Waste Incineration Units ("Definitions Rule"), is contrary to the plain text of the Clean Air Act. I also agree that, as a result, the related rule, the National Emission Standards for Hazardous Air Pollutants for Industrial, Commercial, and Institutional Boilers and Process Heaters ("Boilers Rule"), must be substantially revised. Where I differ is on the appropriate remedy.

The reality in this case is that the question of whether to vacate or remand the rules has been fully addressed by the parties. The initial discussion in the parties' briefs was supplemented by a series of motions and responses by the parties. Thus, the adversarial process has been observed. The question, then, is whether the parties have persuaded the court of the appropriate remedy. The court has no reason to postpone a decision on the question in this case. The fact that over the years the court's remedies in different cases fail to reveal a consistent pattern, *see* concurring opinion of Randolph, J., does not pose an obstacle to proceeding now nor necessarily mean that the remedial responses in particular cases were inappropriate. The particular fact-intensive circumstances in the cases that come before the court involving a variety of regulatory schemes may well mean that there will be no one-rule-fits-all solution.

Where the court has concluded that a final rule is deficient, the court has traditionally not vacated the rule if doing so would have serious adverse implications for public health and the environment. *See, e.g.*, *Sierra Club v. EPA*, 167 F.3d 658, 664 (D.C. Cir. 1999); *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 635 (D.C. Cir. 2000). There have been exceptions, but the court has usually offered a reasoned explanation for its decision, as in

*Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001), which distinguished *Sierra Club* and *National Lime* because the public health considerations favoring remand were offset by rule challenges by industry that the court did not reach but appeared meritorious. Here, the court has rejected industry contentions as regards the Definitions Rule and the interests of the Municipal Petitioners, which only challenged the Boilers Rule, are protected by a separate remand and stay of the compliance date in the Boilers Rule. Order of Mar. 12, 2007. The court is not reaching the merits of any parties' challenge to the Boilers Rule because of the interrelationship between the two rules and the need to afford EPA an opportunity to overhaul that rule in view of the court's conclusion about the Definitions Rule. *See* Op. at 21. But the court can hardly suggest Industry contentions regarding the Boilers Rule appear meritorious. *See, e.g., Sierra Club v. EPA*, 479 F.3d 875, 883 (D.C. Cir. 2007); *Nat'l Lime*, 233 F.3d at 633-34.

The second reality in this case stems from the nature of the court's decision. It is evident from the court's recognition that EPA must conduct a "wholesale revision on remand," Op. at 21, that a considerable period of time may pass before EPA promulgates the revised rules. Although EPA has suggested that a stay of the mandate of the court would be appropriate, *see* Reply in Support of Motion for Voluntary Partial Vacatur and Remand at 3-4, as a practical matter, a lengthy or indefinite stay of the mandate is problematic. Federal Rule of Appellate Procedure 41 calls for the mandate to issue in seven days; our Circuit rule contemplates that a stay of the mandate will ordinarily be for no more than 90 days, D.C. CIR. R. 41(a)(2); and our stays of the mandate have tended, in fact, to be for months, *see, e.g.*, *Chamber of Commerce v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006); *U.S. Telecom Ass'n v. FCC*, No. 00-1012, 2002 U.S. App. LEXIS 18823, at *1 (D.C. Cir. Sept. 4, 2002), not years. We know that the agency response may not even be

a matter of a few years; for example, it took EPA ten years to respond in *Engine Mfgrs. Ass'n v. EPA*, 20 F.3d 1177 (D.C. Cir. 1994), and fifteen years to respond to a remand of the rule in *Envtl. Def. Fund v. EPA,* 898 F.2d 183 (D.C. Cir. 1990); 70 Fed. Reg. 59,582 (Oct. 12, 2005), and then it did so only after a petition for a writ of mandamus had been filed. Even assuming these cases are outliers, EPA has not suggested its response here will be a matter of months. Nor has EPA suggested it could promptly adopt an interim rule were the court to vacate the current rules.

Moreover, it may not always be clear what motivates an agency to act promptly or not after the court has identified problems with its initial rulemaking. There may be professional or political incentives, or other matters to which the agency has accorded a higher priority. Staffing and available resources might affect the timing of the agency's response. So might a technological or scientific breakthrough, or lack thereof. Also, the agency may change its mind or abandon its initial rule or Congress may change the law. Or the court's decision may not impact the agency's pursuit of its regulatory goals. Any mix of these factors or others could affect the expected response time to the court's ruling. Consequently, neither vacating nor remanding, with or without a court imposed deadline, assures a prompt agency response. Vacating a rule removes it from the agency's docket, but interested parties may still seek to encourage or delay further agency action. Remanding leaves the agency's initial approach in effect, and may suggest there is no urgency to act, yet interested parties may take a different view. Even if an agency does not welcome mandamus-driven agency action, the possibility of mandamus may serve as an incentive not to delay unduly regardless of whether the court vacates or remands. Even so, a court-imposed deadline for agency action may not easily be enforced.

EPA has defined the serious adverse implications for public health and the environment resulting from the pollution emitted by the sources regulated by the two challenged rules. All of the hazardous air pollutants emitted by boilers and incinerators cause serious adverse health effects. 69 Fed. Reg. 55,218, 55,220-22 (Sept. 13, 2004). EPA has stated "[h]uman exposure to these combustion air toxics occurs both directly and indirectly and leads to cancer, respiratory diseases, and possibly developmental abnormalities. A preliminary screening analysis suggests that ecosystems are also at risk from these air pollutants." 64 Fed. Reg. 52,828, 53,014 (Sept. 30, 1999). Given the delay likely attendant to the promulgation of new rules or the re-promulgation of partially unlawful rules affecting public health and the environment, Environmental Petitioners favor a remand because although the standards in the two challenged rules may be inadequate, they provide some protection from the hazardous air pollutants emitted by the regulated sources. *See* Opp'n of Envtl. Pet'rs to EPA's Mot. for Partial Vacatur and Cross-Mot. for Deadline to Govern Remand at 2; Resp. & Opp'n of Indus. Intervenors to Envtl. Pet'rs' Opp'n to EPA's Mot. for Voluntary Partial Vacatur and Cross-Mot. for Deadline to Govern Remand at 9-10.

A third reality in this case involves the status of industry compliance. Environmental Petitioners advise, and neither EPA nor industry intervenors disputes, that the compliance date for sources under the Boilers Rule is four months away, and new boilers and process heaters have been in compliance since 2004. *Id.* at 3. Indeed, as regards the Boilers Rule, although not as regards pollutants from incinerators subject to the Definitions Rule, EPA suggests that many sources will remain subject to the current MACT regulations under the Title V permits. *See* Reply in Support of Mot. for Voluntary Partial Vacatur and Remand at 5; Resp. & Opp'n of Indus. Intervenors to Envtl. Pet'rs' Opp'n to EPA's Mot. for Voluntary Partial Vacatur and Cross-Mot. for

5

Deadline to Govern Remand at 9-10.

Under the circumstances, a remand instead of vacatur seems "the better course," *Cement Kiln*, 255 F.3d at 872, because the rules would ensure greater protection to public health and the environment during the time EPA will need to develop and promulgate new rules. *See* Reply in Support of Motion for Voluntary Partial Vacatur and Remand at 8-10. No party has indicated that it wishes to apply for certiorari review by the Supreme Court. *See* concurring opinion of Judge Randolph.

Nonetheless, without questioning the reality of the harms to public health and the environment that EPA has identified and the status of industry compliance, the court concludes no protection is better than some protection to the public health and the environment in the interim. The court's reliance on *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140 (D.C. Cir. 2006), *see* Op. at 19, hardly supports an unqualified vacatur of the rules. Although that case concerned the effect of pollution on aquatic and plant life as distinct from human life, the court remanded the case to the district court to determine "the shortest reasonable timetable" for "an expedited schedule for further rulemaking," *Friends*, 446 F.3d at 148. Moreover, while the case was not moot, the necessary local action had already addressed the environmental problem. *Id.* at 147. The distinctions that the court draws with our other remands are makeweight arguments; for example, in *National Lime*, 233 F.3d at 635, EPA also had failed to follow the statute in promulgating a rule and the court remanded; EPA could not, as the court implies, Op. at 20, promulgate a rule on remand that continued to violate the statute. Rather, agency shortcomings in rulemakings have been the gist of remands. *Cf. Envtl. Def. Fund*, 898 F.2d at 190. The other opinion on which the court relies, *Alabama Power Co. v. EPA*, 40 F.3d 450, 456 (D.C. Cir. 1994), provides no analysis in support of vacatur. Whatever may or may not be the merits of

procedural uniformity, *see* concurring opinion of Judge Randolph, the posture of this case allows the court to decide the remedy now. The supplementary filings have provided the court with the information it needs,[1] and it would be a waste of judicial and party resources to require new filings on remedy in support of a stay upon vacation of the rules.

For these reasons, I would remand the two challenged rules to EPA rather than vacate them.

---

[1] Industry-intervenors's concern, referenced in the concurring opinion of Judge Randolph, arose in the context of opposing Environmental Petitioner's request for a remand with a *two year deadline* for EPA to respond on the basis that EPA could not know the magnitude of the work it must undertake on remand until this court's opinion issues. *See* Resp. & Opp'n of Indus. Intervenors to Envtl. Pet'rs' Opp'n to EPA's Mot. for Voluntary Partial Vacatur and Cross-Mot. for Deadline to Govern Remand at 4; *id*. at 5, 10.